UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| HAYMARKET INSURANCE COMPANY, <br><br>             Plaintiff, <br><br>     -against- <br><br>LEADENHALL CAPITAL PARTNERS LLP, LEADENHALL LIFE INSURANCE LINKED INVESTMENTS FUND PLC, JOHN WELLS, <br><br>            Defendants. | Case No. _____ <br><br><br>**COMPLAINT** <br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Haymarket Insurance Company ("Haymarket"), in its capacity as lender and as beneficiary/holder of senior, perfected security interests, alleges against Defendants Leadenhall Capital Partners LLP, Leadenhall Life Insurance Linked Investments Fund PLC, and John Wells (collectively, "Defendants") as follows:

## NATURE OF THE DISPUTE

1.      This case exists because Defendants Leadenhall Capital Partners LLP ("Leadenhall Capital") and Leadenhall Life Insurance Linked Investments Fund PLC's ("Leadenhall Life," and collectively, "Leadenhall") collateral was failing, its losses were mounting, and its access to capital had dried up. Rather than confront known deficiencies and explicit warnings of "criminal activity" within its own portfolio, Leadenhall concealed its predicament. Instead, it leveraged its insider position at 777 Partners LLC ("777 Partners") and its affiliated entities (collectively, "777") to divert and misappropriate funds belonging to Haymarket to reduce its own exposure. And when Haymarket refused to capitulate to Leadenhall's demands and surrender senior secured rights to

its own collateral, Leadenhall embarked on a blame-shifting campaign by weaponizing the media and suing Haymarket, Advantage Capital Holdings LLC ("A-CAP") (Haymarket's parent), and A-CAP's Chairman and CEO, Kenneth King.

2.      For almost a decade, Leadenhall, acting under the direction of its Chairman John Wells ("Wells"), operated as a deeply embedded creditor within 777. Beginning in 2016, it structured, amended, and actively managed multiple receivables-based lending facilities tied to 777-affiliated entities. Separately, Leadenhall arranged and oversaw a corporate-level lending facility involving Brickell Insurance Holdings LLC ("Brickell") and 777 Re Ltd. ("777 Re"), a Bermuda-domiciled reinsurance affiliate of 777 Partners. Across both sets of financings, Leadenhall dictated key economic and risk terms, had board observer rights for 777 Re and Brickell, received detailed non-public reporting on asset quality and liquidity, and exercised ongoing oversight over the design, administration, and performance of the facilities it sponsored and funded.

3.      By 2021, Leadenhall's receivables platforms were already deteriorating. Collateral verification lagged funding. Advances were made against receivables before purchase and transfer documentation was complete. Borrowing bases relied on assumptions rather than verified ownership and lien status. Instead of stopping funding and addressing these failures, Leadenhall repeatedly granted accommodations, extended relief, and allowed deficiencies to accumulate. The resulting breakdown in collateral integrity was the product of Leadenhall's own failed diligence and internal controls.

4.      At the same time, Leadenhall was suffering far more significant losses elsewhere. Multiple flagship structured-settlement and insurance-linked investments unrelated to 777 were failing or unraveling. Investor confidence in Leadenhall understandably eroded. Capital

commitments from investors were reduced or withdrawn. By late 2022, Leadenhall faced intense pressure to stabilize its funds, manage redemptions, and demonstrate recoveries. Leadenhall's exposure to 777 was not the root of its crisis. It was one of several stressed positions competing for liquidity.

5.     What made 777 different was Leadenhall's level of access. Through its position inside the 777 structure, Leadenhall and Wells had visibility into upstream capital flows that it did not own or legally control. For years, Leadenhall and Wells exploited that information and used its leverage over 777's principals, including Joshua Wander ("Wander") and Steven Pasko ("Pasko") to divert funds to Leadenhall and shift risk onto others.

6.     Haymarket's business relationship with the 777 was on a fundamentally different footing. In 2020, Haymarket extended senior secured financing to 777 Partners and 600 Partners LLC ("600 Partners") at the holding-company level, secured by a first-priority lien on all holding company assets ("HoldCo Loan"). In parallel, Haymarket entered into reinsurance agreements with 777 Re under which certain investments were made through a modified coinsurance ("ModCo") structure.

7.     At all relevant times, 777 Partners and its affiliated entities were controlled and directed by Wander and Pasko, who exercised day-to-day authority over borrowing decisions, collateral reporting, and lender communications. Under their direction, and unbeknownst to Haymarket, 777 systematically misrepresented the existence, ownership, and lien status of receivables and other assets used as collateral across the Haymarket platforms, including by reporting assets that had not been purchased, had been double-pledged, or did not exist. These

misrepresentations were not isolated errors or administrative failures, but part of an ongoing scheme to obtain and maintain financing despite mounting collateral deficiencies.[1]

8.      Leadenhall was not a passive or unwitting lender with respect to this misconduct. Through its deeply embedded position within 777, its board-level access and observer rights, its receipt of detailed non-public reporting, and its direct dealings with Wander and Pasko, Leadenhall and Wells learned of these collateral failures while they were ongoing.

9.      In or around September 2022, Leadenhall received an anonymous tip expressly warning that 777-related receivables securing Leadenhall's facilities did not exist, had never been purchased, or had been pledged to other lenders. The tip also referenced potential "criminal" activity at 777. Despite its board-level access and direct visibility into the insurance platform, Leadenhall did not call an emergency board meeting to raise these issues with the board of 777 Re. It did not initiate an internal investigation or commission an independent review. It did not confront Wander or Pasko. Nor did it disclose the tip or its substance to Haymarket.

10.      On recorded calls with Wells in March and April 2023, Wander confirmed that receivables had been double-pledged and that substantial portions of the purported collateral had never been purchased. During the April call, Wells pivoted the discussion to Haymarket's assets

---

[1] Wander, Pasko, and certain 777-affiliated entities are separately and independently liable to Haymarket for the conduct described herein, including fraudulent misrepresentations regarding collateral existence, diversion of proceeds, and related misconduct. Haymarket has not named Wander and Pasko as defendants in this action at this time for prudential and procedural reasons, including recent criminal proceedings and a contemporaneous civil enforcement action brought by the U.S. Securities and Exchange Commission, which may affect Haymarket's orderly adjudication of the claims alleged herein. Haymarket further understands that SuttonPark Capital LLC and certain 777-affiliates have represented in related proceedings that they lack sufficient assets to satisfy liabilities materially smaller than those asserted here. *See Leadenhall Capital Partners LLP v. Wander et al.*, No. 1:24-cv-03453 (S.D.N.Y.). However, nothing in this Complaint shall be construed to waive, release, compromise, estop, or otherwise prejudice any claim, right, remedy, or cause of action that Haymarket or any other A-CAP affiliate has or may have, whether known or unknown, against Wander, Pasko, SuttonPark Capital LLC, or any other 777-affiliated person or entity. All such claims and rights are expressly, unequivocally, and fully reserved.

and, under the guise of cooperative lender coordination, subsequently initiated discussions with Haymarket, through A-CAP, concerning lien restructurings, intercreditor arrangements, and related mechanisms designed to elevate Leadenhall's junior position.

11.     During these discussions, Defendants repeatedly acknowledged Haymarket's perfected senior secured position. But rather than disclosing the defects in its own collateral, Defendants framed the crisis as a series of temporary "shortfalls," masking the reality that collateral supporting its facilities did not exist or was double pledged to other lenders.

12.     When Haymarket refused to purchase Leadenhall's assets and declined to relinquish rights to its collateral, Leadenhall escalated tactics and embarked on a sustained pressure campaign. As discussed below, Haymarket is informed and believes that Leadenhall selectively leaked information to media outlets to influence regulators and recast Leadenhall's own diligence failures as supposed misconduct by A-CAP and its Chairman and CEO, Kenneth King. When negotiations broke down, Leadenhall then filed a lawsuit in the Southern District of New York lacking any legitimate basis.

13.     This action seeks to hold Leadenhall and John Wells accountable for a coordinated deception carried out alongside Wander, Pasko, and 777. Through the fraudulent concealment, misrepresentations, and diversion schemes alleged herein, Haymarket is informed and believes that Leadenhall, acting at the express direction of Wells and in coordination with Wander and Pasko, extracted and retained more than $75 million of Haymarket's senior-secured capital. Those extractions included more than $35 million in unauthorized HoldCo Loan draws between October 2021 and May 2022, a paydown exceeding $30 million on Leadenhall's structured-settlement facility, funded directly through a June 30, 2022 HoldCo Loan draw, and additional payments

exceeding $10 million, funded with proceeds from an investment held within Haymarket's ModCo account.

14.     At bottom, Defendants used inside access at 777 to induce fraud against Haymarket and divert its funds to cure Leadenhall's own losses. As a result, Haymarket seeks damages of at least $75 million against Leadenhall and Wells, jointly and severally.

## THE PARTIES

15.     Plaintiff Haymarket is a Utah-domiciled insurance company and corporation with its principal place of business at 415 Bedford Road, Suite 102, Pleasantville, New York 10570. Haymarket has been a senior secured creditor to 777 and 600 Partners under the HoldCo Loan, which is evidenced by a Loan and Security Agreement dated February 27, 2020 and subsequent amendments and restatements. Haymarket holds perfected first priority "all asset" security interests at the holding company level. Haymarket and 777 Re are also parties to Reinsurance Agreements dated July 31, 2019 and December 31, 2020 ("Reinsurance Agreements").

16.     Defendant Leadenhall Capital is a limited liability partnership organized under the laws of England and Wales with its principal place of business in London, England. Leadenhall is the investment manager and administrative agent for the Lenders under the May 7, 2021 Loan and Security Agreement with 777 Partners and affiliates ("Leadenhall LSA").

17.     Defendant Leadenhall Life is an investment company organized under the laws of Ireland with its principal place of business in Dublin, Ireland. Leadenhall Life is the collateral agent and holds security interests under the Leadenhall LSA in the structured-settlement receivables and equity in special purpose entities owned by affiliates of 777 Partners.

18.     Haymarket alleges, on information and belief, that Defendant John Wells is an individual who resides in the United Kingdom. At all relevant times, Wells was the Chairman of

Leadenhall Capital and exercised decision-making authority over Leadenhall's lending, restructuring, enforcement, and capital-allocation activities. Wells transacted business in New York and purposefully directed conduct toward New York, including by participating in and directing negotiations, communications, approvals, and decisions relating to Leadenhall's loans to 777 Partners and affiliated entities and the diversion and misuse of capital provided by A-CAP and its affiliates. Wells's acts were purposefully directed at New York and caused foreseeable effects in New York, rendering jurisdiction and venue proper as to Wells.

### RELEVANT NON-PARTY ENTITIES

19.     777 Partners is a privately held investment firm that operates through a network of affiliated entities involved in insurance, receivables financing, and related businesses. 600 Partners is a Delaware limited liability company affiliated with 777 Partners and maintains its principal place of business at the same Miami address. Together, 777 Partners and 600 Partners sit at the holding-company level of the 777 structure and owned or were affiliated with the borrower, seller, and servicer entities that entered into transactions discussed below.

20.     At all relevant times, 777 Partners and its affiliates were controlled by Joshua Wander and Steven Pasko, who directed the borrowing, collateral reporting, and lender communications for the enterprise. Under their direction, 777 entities routinely misrepresented the existence, ownership, and lien status of receivables used as collateral across multiple financing platforms. Leadenhall was not an outsider to this misconduct. Through its embedded position at 777, board-level access, and direct dealings with Wander and Pasko, Leadenhall and Wells learned of these failures and chose to exploit them and use its leverage to divert Haymarket's funds to reduce its own losses.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are entirely diverse and the amount in controversy exceeds $75,000. Plaintiff Haymarket is a Utah corporation and has a principal place of business in Pleasantville, New York. Based upon publicly available information, Haymarket alleges on information and belief that Leadenhall Capital is composed of the following partners: John Wells, Luca Albertini, Lorenzo Volpi, Craig Gillespie, Tom Spreutels, Phil Kane, Chris Learmonth, Kelvin Granger, and Kunal Shah are each individuals and citizens of the United Kingdom; Ben Adolph is an individual citizen of Bermuda; and Mitsui Sumitomo Insurance Company Limited is a Japanese corporation with its principal place of business in Japan.

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this Complaint occurred in this District. At all relevant times, Leadenhall knew that A-CAP functioned as the New York-based holding company and decision-making interface through which Haymarket exercised its contractual rights, enforced security interests, and evaluated restructuring proposals. Leadenhall's communications, negotiations, and disclosures were therefore directed to A-CAP's officers with the understanding that A-CAP was acting on behalf of Haymarket in connection with the transactions at issue. As a result, Leadenhall's communications of materially misleading or incomplete information to A-CAP, its concealment of known fraud indicators, and its efforts to induce concessions, lien subordination, or capital infusions were intended to, and did, impair Haymarket's senior secured rights.

23.    Leadenhall and Wells have consented to personal jurisdiction and venue in New York by purposefully directing material communications and negotiations into this District that

form the basis of Haymarket's claims. Leadenhall further confirmed venue in this District by voluntarily commencing and prosecuting related litigation arising out of some of the same underlying transactions and events, including *Leadenhall Capital Partners LLP, et al. v. Wander, et al.*, No. 1:24-cv-03453 (S.D.N.Y.).

## STATEMENT OF FACTS

**A.    Leadenhall Starts Long-Term Lending Relationship with 777 Beginning in 2016.**

24.    Leadenhall's lending relationship with 777 began in 2016, wherein Leadenhall financed, amended, refinanced, and managed portfolios of structured-settlement and similar receivables held through multiple 777-affiliated special-purpose entities, including SuttonPark Capital LLC and its affiliated borrower and servicer entities (collectively, "SuttonPark"), Dorchester Receivables II LLC ("Dorchester"), Insurety Agency Services LLC ("Insurety"), Signal SML 4 LLC ("Signal"), and SPLCSS II LLC ("SPLCSS II"). Dorchester, Insurety, Signal, and SPLCSS served as borrowers or collateral-holding vehicles under ***Leadenhall-managed*** facilities and formed the core of Leadenhall's receivables-lending relationship with the 777 structure.

25.    On June 28, 2016, Leadenhall entered into a revolving credit facility with SPLCSS 2016, LLC, under which SPLCSS 2016 pledged portfolios of structured-settlement receivables originated by SuttonPark Capital in exchange for funding from Leadenhall-managed lenders. Under the structure approved by Leadenhall, SuttonPark Capital acquired the receivables, SuttonPark Servicing collected and remitted payments, Leadenhall acted as administrative agent, and a designated collateral agent held perfected liens for the benefit of lenders. Leadenhall retained authority over collateral eligibility, borrowing limits, advance rates, repayment mechanics, and reporting requirements, and exercised those controls throughout the life of the facility.

26.    On September 22, 2016, Leadenhall entered into a parallel credit facility with Dorchester based on the same core framework. Dorchester pledged structured-settlement receivables originated by SuttonPark Capital and serviced by SuttonPark Servicing. Over time, Leadenhall amended the Dorchester facility through assignment and acceptance agreements, distribution arrangements, and related modifications that adjusted lending limits, refined collateral eligibility criteria, and reallocated lender interests. These changes responded to portfolio performance, refinancing activity, and capital-deployment considerations, and required Leadenhall's approval.

27.    On March 17, 2017, Leadenhall entered into another credit agreement with SPLCSS II LLC, again structured around SuttonPark-originated receivables serviced by SuttonPark Servicing, but managed by Leadenhall. Between 2017 and 2019, Leadenhall repeatedly amended the SPLCSS II facility through assignment and release agreements, payoff arrangements, revised borrowing-base formulas, and changes to repayment and redeployment mechanics. Leadenhall treated SPLCSS II as a short-term warehouse facility designed to be drawn, refinanced, repaid, and redeployed in coordination with longer-term financing structures.

28.    Throughout this period, Leadenhall received regular borrowing requests, compliance reports, repayment proposals, and refinancing notices from the 777-affiliated special-purpose entities. Leadenhall used these materials to monitor collateral composition, borrowing-base compliance, repayment timing, refinancing risk, and aggregate exposure across multiple facilities and investment mandates.

29.    In addition to formal amendments, Leadenhall entered into side letters, negotiated accommodations, and transaction-specific concessions with 777-affiliated borrowers beginning no later than 2017. These included approvals for early or partial repayments, temporary deviations

from repayment restrictions, adjustments to economic terms to address redeployment risk, and discretionary decisions regarding whether and when repaid capital could be re-advanced through warehouse or long-term facilities. These accommodations reflected negotiated credit decisions made in the context of portfolio liquidity, refinancing dynamics, and the ongoing commercial relationship.

30.    By at least 2019, Leadenhall was actively managing borrowing-base pressure and liquidity stress across multiple 777-affiliated facilities. It exercised discretion over collections, repayment timing, valuation inputs, and funding cadence, and evaluated whether repayments, refinancing transactions, or continued funding would advance or impair portfolio objectives, including fee generation, capital redeployment, and exposure management. Leadenhall conditioned access to cash flows and new advances on those assessments.

31.    In late 2019 and early 2020, those pressures intensified as refinancing activity, partial repayments, and valuation changes intersected across interconnected facilities. During that period, substantial collections and repayments did not consistently translate into improved borrowing-base positions or greater collateral stability. Instead, changes in valuation assumptions, refinancing timing, and redeployment constraints produced expanding deficiencies and liquidity mismatches in certain portfolios. In response, Leadenhall directed that collections be applied to principal reduction, restricted further advances, and required reconciliation and remediation before permitting renewed funding.

32.    Leadenhall treated these developments as portfolio-level credit and liquidity management issues rather than isolated variances. Although remedial measures temporarily reduced deficiencies, shortfalls re-emerged as refinancing plans evolved and underlying assumptions shifted. Leadenhall responded by selectively restricting or conditioning funding,

exercising discretion over repayment and redeployment mechanics, and balancing credit risk against the commercial objectives of maintaining origination pipelines and borrower relationships across its managed funds.

33.     By 2021, Leadenhall had established itself as a long-standing lender and active manager of receivables-based investment platforms affiliated with 777 Partners. That year, Leadenhall rolled up its prior credit facilities with SuttonPark, Dorchester, Signal, and SPLCSS II into the Leadenhall LSA.

**B.     In Addition to the Millions Invested Into 777 Asset-Backed Facilities, Leadenhall Loans Over $126 Million to 777's Insurance Platform.**

34.     Leadenhall's exposure to the 777 enterprise extended beyond asset-based lending against discrete pools of structured-settlement receivables. Beginning in December 2018, Leadenhall also extended a secured term loan facility directly to 777's reinsurance platform, which included Brickell and 777 Re ("Brickell Term Loan"). The Brickell Term Loan was structured as enterprise-level balance-sheet financing, rather than a borrowing-base facility tied to identified receivables and was documented under a Credit Agreement dated December 31, 2018. Under that agreement, Leadenhall acted as administrative agent, and affiliated Leadenhall investment vehicles served as lenders.

35.     Unlike Leadenhall's structured-settlement facilities, which relied on borrowing-base mechanics and eligibility criteria tied to individual receivables, the Brickell Term Loan functioned as corporate-level financing intended to support the capitalization and downstream operations of 777's insurance platform. That platform included Brickell Insurance Holdings LLC ("Brickell") and its regulated insurance and reinsurance subsidiaries. Repayment and collateral

coverage depended on the enterprise value of the insurance platform itself, rather than the performance of segregated asset pools.

36.     Through the Brickell Term Loan, Leadenhall extended more than $126 million in credit to 777 and its insurance-related holding-company structure. The loans were secured primarily by equity interests in 777's insurance platform, including equity in Randall & Quilter Investment Holdings Ltd. ("RQIH"), 777 Re, and Merit Life Insurance Company, rather than by receivables or cash-flow-based collateral.

37.     Through the Brickell Term Loan, Leadenhall also had governance and information rights extending beyond those typical of an arm's-length lender. In connection with the balance-sheet facility, Leadenhall obtained contractual rights to observe, and in certain circumstances participated in, board-level proceedings of 777 Re and Brickell. Leadenhall also obtained rights to receive contemporaneous board materials and related communications.

38.     Haymarket is informed and believes that Leadenhall exercised these observer and information rights during the life of the term loan facility, including by requesting inclusion on board correspondence and meetings not limited to formal quarterly sessions. These rights gave Leadenhall direct, ongoing visibility into the capitalization, liquidity, regulatory posture, and strategic decision-making of 777 and its insurance-platform subsidiaries.

39.     By mid-2020, the secured term loan facility was subject to heightened loan-to-value stress, driven by declining or disputed valuations of the insurance-platform equity securing the loans. Internal communications during July and August 2020 reflected active lender concern that updated equity valuations were insufficient to support outstanding loan balances without amendment, accommodation, or additional controls.

C.    **Haymarket and 777 Re Enter Into Reinsurance Agreements With 777 Re.**

40.    Haymarket entered into the Reinsurance Agreements with 777 Re in 2019 and 2020 pursuant to which Haymarket retroceded liabilities associated with insurance policies to the 777 Re under a ModCo structure. Under the ModCo structure, the insurance policies and supporting assets remained on Haymarket's balance sheet, but the economic risks (upside and downside) and legal obligations under the policies (i.e., gains, losses, and funding obligations) were borne by 777 Re. If reserve requirements increased or the value of ModCo assets declined, 777 Re was required to fund the ModCo account in cash. But where the account was overfunded, excess cash could be released to 777 Re.

41.    The ModCo account was not a passive holding account, but an actively managed investment account through which Haymarket entered into credit facilities backed by structured-settlement receivables. Although Haymarket was the nominal lender and retained legal title to assets serving as collateral, those assets were segregated, accounted for separately, and economically attributable to the reinsured business. Critically, unlike Leadenhall's structured-settlement facilities, which Leadenhall administered, monitored, and controlled, Haymarket (and A-CAP) did not manage, service, or oversee the acquisition, valuation, or ongoing administration of the structured-settlement receivables pledged in the ModCo account.

42.    In connection with both Reinsurance Agreements, Haymarket delegated all investment discretion over ModCo accounts to 777 Asset Management LLC ("777 AM"), a wholly owned affiliate of 777 Partners. As the appointed investment manager, 777 AM was subject to investment guidelines specified in the contracts. 777 AM also selected, structured, executed, and managed the structured-settlement credit facilities and the receivables pledged as collateral. Haymarket (and A-CAP) did not participate in collateral selection, did not control portfolio

construction, did not administer or service receivables, and did not receive real-time portfolio-level information sufficient to independently verify whether any receivable had been pledged elsewhere. As a result, Haymarket had no visibility into, and no practical ability to detect or prevent, any double pledging of collateral by 777 or its affiliates.

**D.    Haymarket Enters Into Senior Secured HoldCo Loan With Anti-Diversion Protections.**

43.    In February 2020, Haymarket entered into the HoldCo Loan with 777 Partners pursuant to a Loan and Security Agreement dated February 27, 2020. In connection with the HoldCo Loan, Haymarket agreed to and did extend credit to 777 Partners and 777 Partners granted a security interest to secure the obligations thereunder. Under Section 2.5 of the Loan and Security Agreement, 777 Partners granted a "valid, perfected and continuing first priority security interest and lien" on all of its assets, including investment property and equity interests, accounts, chattel paper, general intangibles, intellectual property, goods, instruments, deposit accounts, and proceeds, among other categories, subject to customary exclusions and "Permitted Liens."

44.    Contemporaneously, 600 Partners executed and delivered in Haymarket's favor a corporate guaranty and a Pledge and Security Agreement dated February 27, 2020, granting a first priority security interest over its pledged collateral, including downstream equity interests in specified subsidiaries and related rights, to secure the HoldCo Loan obligations, and 777 Partners likewise executed a Pledge and Security Agreement over its equity and related collateral, each expressly stating the liens were first priority and perfected. These security interests were further supported by UCC-1 filings and related documents identifying "all assets" descriptions consistent with Article 9, thereby evidencing perfection and priority in favor of Haymarket, subject to permitted liens and excluded property.

15

45.    As executed, the HoldCo Loan imposed lender protective restrictions governing use of proceeds, leverage, liens, and value leakage. The agreement prohibited using proceeds to purchase or carry "margin stock" or "margin security," and required that "the proceeds of the Advance shall be used for working capital purposes" of the borrower, as set out in Section 5.16, thereby constraining use of proceeds to working capital and expressly barring margin stock activity. To prevent leakage and ensure prompt deleveraging upon liquidity events, Section 2.4 established mandatory prepayments requiring 777 Partners to "immediately pay" to Haymarket proceeds from specified transactions, including (i) sales or issuances of equity or debt securities by a Borrower Party, (ii) incurrence of indebtedness other than that permitted under the facility, and (iii) Net Proceeds from dispositions of "Portfolio Investments," with required prepayments in amounts equal to such proceeds or Net Proceeds, and without prejudice to the lender's default remedies.

46.    These payment waterfall protections were reinforced by negative covenants barring new indebtedness and liens except as expressly permitted, including the covenant that "[o]ther than Permitted Indebtedness, Borrower shall not create, incur, assume or suffer to exist any Indebtedness," and that Borrower "shall not create, incur, assume or suffer to exist any Lien upon, in or against, or pledge of, any of the Collateral," except for Permitted Liens, thereby restricting incremental leverage and collateralization without consent. The agreement further required full and timely cash payment of all obligations when due and maintained tight controls on distributions and transfers to protect collateral value in favor of the senior facility, including restrictions on dividends, distributions, and affiliate leakage subject to narrow exceptions, working in tandem with the mandatory prepayment regime to prioritize application of holding company cash to the HoldCo Loan.

47.    By perfecting first priority liens across key guarantors and by prescribing controlled cash application mechanics tied to collateral events, the HoldCo Loan was structured to block 777 from diverting funds to affiliated, special purpose entity borrowers and to ensure that asset monetizations and financings benefitted the HoldCo Loan first. Effective November 2, 2023, the parties amended and restated the HoldCo Loan to add 600 Partners as a co-Borrower together with 777 Partners.

48.    Leadenhall knew that Haymarket had extended senior secured financing at the holding company level and that Haymarket's loan occupied a first-priority position across substantially all holding company assets and downstream equity. Leadenhall's knowledge arose from its direct and ongoing communications with Haymarket and 777 principals regarding capitalization and liquidity at the parent and insurance-platform levels, its longstanding role as a major creditor actively managing 777's balance-sheet and receivables-based financing, and its access to non-public information through board-level observation and information rights associated with 777 Re and Brickell-affiliated entities.

49.    Based on Leadenhall's direct communications with 777, Haymarket is informed and believes that Leadenhall understood that the HoldCo Loan imposed strict limitations on use of proceeds, additional indebtedness, liens, and intercompany transfers, and was structured to prevent diversion of capital to junior or subordinated creditors. Notwithstanding that knowledge, Haymarket is also informed and believes that Leadenhall knowingly facilitated, encouraged, or accepted transactions that used or were supported by funds drawn from the HoldCo Loan to stabilize or repay Leadenhall-managed facilities, in direct conflict with Haymarket's senior rights and the HoldCo Loan's contractual protections.

**E.**    **Leadenhall Repackages Prior Facilities With No Security Interests on Non-Borrower Entities.**

50.    On May 7, 2021, Leadenhall and four special-purpose entities affiliated with 777 (SuttonPark, Dorchester, Insurety, and Signal) executed the Leadenhall LSA.

51.    The Leadenhall LSA was expressly structured as a successor agreement intended to consolidate and replace multiple legacy facilities that were already exhibiting stress, including borrowing-base deficiencies, expired waivers, and fragmented documentation. In fact, around that time, Craig Gillespie reported a deficit of $21,615,080.54 for Insurety, $3,914,542.37 for Dorchester, and "a total deficit of $25,529,622.92."

52.    Critically, the Leadenhall LSA was a strict borrower-level security structure. Each borrower's obligations were secured only by receivables actually acquired and owned by that borrower and by equity interests in the borrower special-purpose entities. The security interests granted under the Leadenhall LSA expressly did not attach to assets of guarantors, affiliates, parent entities, or holding companies, and did not extend beyond the defined collateral pools of each borrower platform.

53.    Consistent with those limits, the Leadenhall LSA contemplated repayment solely from collections on pledged receivables flowing through controlled collection and deposit accounts. The agreement did not permit Leadenhall to rely on guarantor assets, affiliate funding, capital infusions, or upstream financing to satisfy borrower obligations or cure borrowing-base deficiencies. These constraints were fundamental to the Leadenhall LSA's risk allocation and payment waterfall.

**F.      Leadenhall Fails to Verify Collateral and Causes Fraudulent Misappropriation of HoldCo Loan Proceeds.**

54.      After execution of the Leadenhall LSA, Leadenhall funded and expanded the structured-settlement facilities without implementing the file-level diligence and collateral verification. Advances were not conditioned on completed assignments, acknowledgments, or perfected transfer and liens for individual receivables. Instead, Leadenhall approved collateral based largely on spreadsheet schedules provided by 777, which listed assets by date and file name. Executed transfer documents and complete file packets were often missing at the time of funding, and assignments and compliance materials were frequently finalized only after advances had been made.

55.      That practice continued throughout 2021. SuttonPark submitted monthly compliance reports and draw requests supported primarily by spreadsheet schedules, and Haymarket is informed and believes that Leadenhall processed advances despite unresolved gaps in asset descriptions, eligibility calculations, and reporting inputs. Haymarket is further informed and believes that adjustments to amortization assumptions, rate resets, concentration limits, and default classifications were handled after funding rather than as conditions precedent. Borrowing-base availability thus depended increasingly on assumed performance and incomplete data rather than verified receivable status.

56.      Over time, weaknesses in the collateral base became evident. Default tracking, mortality monitoring, and delinquency removal lagged actual asset performance. Receivables that should have been excluded from borrowing bases remained in reported pools, and advance-rate concessions granted during expansion periods were not timely reconciled. Borrowing-base calculations therefore overstated enforceable cash-flow support.

57.     Leadenhall's lackluster approach to diligence and oversight was not isolated to these facilities. In August 2021, shortly after execution of the Leadenhall LSA, the Delaware Superior Court issued a post-trial decision in *Brighthouse Life Insurance Co. v. Geronta Funding* describing a Leadenhall-managed life insurance backed investment in which basic verification of whether an insured was alive was not performed before closing. The court cited testimony that Geronta, acting on Leadenhall's advice, avoided confirming the insured's status because doing so could eliminate the investment's upside. The documents in the court's file further reveal the same deficiencies that occurred with respect to 777.

58.     That approach to diligence carried consequences across Leadenhall's 777 exposure. As documentation gaps widened, borrowing bases contracted, and uncertainty grew as to whether pledged assets even met their most basic predicates, Leadenhall entered 2022 under acute pressure to reduce exposure and extract paydowns across its portfolio. Rather than correct those deficiencies within its own facilities, Leadenhall leveraged its control rights, refinancing leverage, and ongoing board-level oversight to press 777 to divert capital away from 600 Partners and 777 Partners and toward Leadenhall-managed obligations, which conflicted with the use-of-proceeds and lien protections of Haymarket's senior secured financing.

**G.     Leadenhall Fraudulently Diverts More Than $35 Million of HoldCo Loan Proceeds.**

59.     By the end of 2021, Leadenhall no longer treated the structured-settlement facilities as capable of self-correction. Rather than require durable remediation, it repeatedly granted short-term relief that expanded borrowing capacity while expressly assuming that baseline conditions would be restored once external liquidity became available.

60.     These accommodations were not structured as credit-positive re-underwriting. They were temporary, conditional measures designed to release incremental cash on the

expectation that a near-term restructuring or refinancing elsewhere in the 777 structure would generate proceeds sufficient to reduce exposure. The relief functioned as a bridge that deferred enforcement while Leadenhall awaited capital from other parts of the enterprise.

61.    Leadenhall did not pair these temporary uplifts with asset-level verification, substitution discipline, or permanent structural protections. The collateral weaknesses remained. What changed was the amount of liquidity Leadenhall permitted to be extracted in the interim.

62.    By early 2022, the deterioration had become systemic. Reported collections no longer consistently matched bank activity, default indicators were applied unevenly, and pledged receivables still lacked executed assignments in many cases. Efforts to address borrowing-base shortfalls relied on additional pledges and spreadsheet updates rather than completed file transfers and lien confirmation. Collateral identification and verification had materially fallen behind collateral movement.

63.    The consequences soon appeared in liquidity and payment performance. Interest servicing became strained, reporting lagged, and cash breaks emerged across platforms. Leadenhall began confronting missed or delayed payments, defective receivables, and mounting questions about portfolio integrity. Account-control mechanisms were prepared and invoked only after these failures had crystallized, linking arrears and defaults to the earlier acceptance of incomplete documentation and unverified collateral.

64.    Leadenhall understood that its exposure under the Leadenhall LSA could not be resolved through ordinary amortization or portfolio remediation. Instead, unbeknownst to A-CAP and Haymarket, Leadenhall positioned itself to benefit from transactions that diverted funds from Haymarket's HoldCo Loan toward Leadenhall's facilities. This was not inadvertent. Leadenhall understood the leverage it had over 777 and, at the direction of Wells, used that leverage to extract

liquidity through discrete draw-and-pay windows, using 777 as the conduit to route Haymarket funds toward Leadenhall debt service and paydowns.

65.     Based on documentation relating to sources and uses received by Haymarket, Haymarket is informed and believes that Leadenhall, at the direction of Wells, caused 777 to divert and misappropriate over $35 million in unauthorized draws from the HoldCo Loan between October 2021 and May 2022.

**H.     Leadenhall Uses a $50 Million HoldCo Draw to Engineer Its Own Payoff.**

66.     The Brickell Term Loan granted Leadenhall board-level oversight and information rights at the highest levels of the insurance platform, including board-observer rights at Brickell and its regulated subsidiaries, 777 Re and Merit Life. At the direction of Wells, Leadenhall began exercising those rights no later than April 2022. Those rights included participation in regular and *ad hoc* board meetings, receipt of agendas and materials, and direct visibility into capital adequacy, liquidity constraints, regulatory issues, covenant compliance, and refinancing strategy.

67.     Haymarket is informed and believes that Leadenhall personnel, including Wells, Craig Gillespie, and Phil Kane, regularly participated in board-level updates and discussions through 777 Re and related affiliated entities, alongside management, reflecting sustained oversight rather than episodic monitoring. That involvement was not passive or advisory in nature. To the contrary, Leadenhall, including Wells, acting through these board-level roles and information channels, actively engaged on matters central to risk and recovery, including capital-raise timing, covenant relief, non-life and aviation exposure limits, ratings pressure, waiver strategy, and refinancing and paydown scenarios. By virtue of this ongoing board-level involvement at 777 Re and affiliated entities, Leadenhall had real-time knowledge of the platform's

financial distress and its dependence on external capital, and used that access and influence to shape transactions that protected Leadenhall's position and accelerated its own de-risking.

68.    By early 2022, Leadenhall was monitoring interest accruals, financial reporting, and liquidity at Brickell and 777 Re through its board-level access and oversight of those entities. As the performance of structured settlement facilities deteriorated, Leadenhall's Brickell Term Loan exposure faced increasing risk of impairment or illiquidity absent a refinancing or meaningful external capital.

69.    In response, and by mid-2022, Leadenhall pursued a refinancing that would reduce and reposition its Brickell Term Loan exposure by bringing in a senior lender to replace Leadenhall's corporate credit risk and to pay down a substantial portion of Leadenhall's outstanding balance. Leadenhall participated in the negotiations for that refinancing and was actively involved in its timing and execution alongside Brickell and 777 Re.

70.    On May 31, 2022, 777 noted that it was going to "be an interesting/crucial next few weeks." Jorge Beruff, a 777 managing partner, noted that the "missed splcss payment hurt" and that he was "having trouble getting leadenhall to close on this BIH financing … that didn't help." Another 777 employee responded, "Yeah I knew that was going to harm things. Those payments are technically due the 12th and leadenhall let's [*sic*] it run to end of month, but going into the following month is absurd."

71.    The following month, on June 16, 2022, a 777 employee reported that "Craig [Gillespie] basically said everyone at [Leadenhall] is worried because they know about credigy situation from earlier in the year, which I explained has improved (ie they've funded deals on Volans, and working on 1 yr extension)." They also noted that 777 "was out of compliance" on the loan that was in the process of being refinanced.

72.    On or about June 20, 2022, Gillespie also sent an email to Damien Alfalla and others at 777 requesting "(i) overall debt facilities and (ii) HoldCo Debts with their financial covenants." Haymarket is informed that Gillespie received this information and, therefore, was informed about the most recent terms, restrictions, and covenants of the HoldCo Loan as of that date.

73.    The refinancing eventually closed on June 30, 2022. On that date, Brickell's legacy term loan exposure to Leadenhall was restructured through a new senior term loan with BMO Harris Bank, N.A. ("BMO"), pursuant to which Leadenhall received a payoff exceeding $30 million, comprised of principal, accrued interest, and fees, and materially reduced its outstanding exposure to the 777 insurance platform at a time when liquidity pressures and collateral concerns were intensifying across the enterprise.

74.    Leadenhall's de-risking did not occur in isolation. The June 30 restructuring was enabled by, and executed contemporaneously with, a draw under the HoldCo Loan of approximately $51.28 million. The HoldCo Loan draw was intended to support 777 and act as a bridge to a follow-on transaction with Sound Point Capital Management, LP ("Sound Point"), which was initially intended to fund approximately $250 million at closing and an additional $100 million Sound Point upsize anticipated shortly thereafter. No Sound Point transaction ever occurred.

75.    Leadenhall was aware that the HoldCo Loan draw was intended to be temporary based on its participation in the refinancing negotiations and information received during board meetings. However, when 777 learned in or about August 2022 that the Sound Point transaction would not proceed, 777 and Leadenhall applied the June 30 HoldCo Loan draw to pay down $50 million in outstanding obligations on Leadenhall's structured settlement loans. In fact, according

to a sources and uses document provided by 777, at least $14,549,519 was applied to SPLCSS II, $3,400,000 was applied to Signal, and $790,000 was applied to Insurety.

76.     As a result, the funds advanced by Haymarket under the HoldCo Loan functioned not as capital funding future financing but as liquidity support addressing shortfalls and stabilizing structured settlement facilities managed by Leadenhall.

77.     Leadenhall's conduct with respect to the June 2022 HoldCo draw was not an isolated incident, but part of a broader pattern of extracting cash to protect its subordinated position notwithstanding express contractual prohibitions. Following the June 30 refinancing, Brickell and its affiliates later defaulted under the senior credit facility, triggering events of default under the applicable intercreditor arrangements. Despite those defaults, Leadenhall accepted and retained cash payments in an aggregate amount of $3,963,915.03 on account of its subordinated debt, which the governing intercreditor agreement expressly prohibited and required to be held in trust for BMO.

78.     On December 17, 2025, BMO sued Leadenhall in this District.[2] According to the lawsuit, Leadenhall admitted that the payments were improperly received, agreed they were subject to turnover, and nonetheless refused to return the funds after the conditions for any temporary standstill expired. As a result, BMO had to sue Leadenhall to recover those funds. This conduct mirrors Leadenhall's actions here—*i.e.*, using superior access, leverage, and timing to divert liquidity to itself despite its junior status, at moments of acute distress, and doing so at the expense of senior capital providers.

---

[2] *See BMO Bank N.A. v. Leadenhall Capital Partners LLP, et al.*, Case No. 1:25-cv-10476 (S.D.N.Y. Dec. 17, 2025).

**I.    Leadenhall Receives a Warning of Missing and Criminally Pledged Collateral and Chooses Not to Investigate.**

79.    On September 19, 2022, Leadenhall received an anonymous tip warning that the structured-settlement assets securing its SuttonPark facility "do not exist," were "already pledged," and were tied to "criminal" activity.

80.    At the time of the tip, Leadenhall was actively exercising board-observer and information rights at Brickell and 777 Re, including attendance at board meetings and routine receipt of board materials. Leadenhall therefore had direct access to 777's senior management, governance processes, and compliance channels and was positioned to raise concerns or initiate an investigation at the board level.

81.    Despite that intimate access and the ability to verify the serious allegations conveyed in the anonymous tip, Leadenhall continued to operate as if nothing had changed. It did not disclose the tip to Haymarket or A-CAP. It did not initiate a targeted investigation, commission an independent review, invoke internal audit or whistleblower procedures, or confront 777 principals regarding the allegations. Instead, Leadenhall's board-level engagement focused on revising covenants, tightening risk frameworks, and repositioning its exposure. These steps directed toward managing leverage and recovery rather than determining whether the collateral securing its facilities in fact existed.

82.    The warning coincided with visible deterioration in Leadenhall's asset-based lending facilities. Through the fall of 2022, court filings now reveal that borrowing bases tightened as delinquent receivables accumulated, advance-rate concessions expired, and reported collateral values became increasingly sensitive to minor assumption changes. Liquidity grew fragile,

dependent on short-term accommodation rather than durable collateral performance, while documentation gaps and reporting delays obscured true asset quality.

83.    The condition of Leadenhall's asset-based loans to 777 only materially worsened. Interest servicing grew strained, reporting lagged, and Leadenhall's ability to reconcile collections to collateral pools and cash accounts deteriorated. The facilities were no longer operating as stable, self-liquidating structures, but as stressed platforms requiring constant intervention to avoid default.

**J.    Leadenhall Fraudulently Extracts ModCo-Sourced Funds Through the Med Set Upsize.**

84.    In October 2022, amid continuing liquidity stress across the 777 enterprise following Leadenhall's June de-risking, 777 restructured an insurance-branded receivables investment vehicle funded through modified coinsurance participations by Haymarket and other A-CAP affiliates.

85.    On October 21, 2022, Med Set Funding LLC (f/k/a 777 Re Investments LLC) ("Med Set") entered into a Second Amended and Restated Participation Repurchase Agreement with Haymarket, together with the execution of an Omnibus Participation Agreement and a contemporaneous second amendment to the underlying Amended and Restated Credit Agreement that increased total commitments from $110 million to $160 million. The transaction consolidated Haymarket's and other A-CAP affiliates' existing participation interests into an omnibus participation structure and reaffirmed Med Set's repurchase obligations in favor of Haymarket upon specified Repurchase Events. Under this structure, Med Set acted as lender and agent under the revolving credit facility made available to affiliated borrower SPVs, while Haymarket held an

undivided participation interest directly against Med Set, with contractual buyback rights tied to the facility.

86.    The stated purpose and agreed use of proceeds for the October 2022 upsize and the ensuing delayed-draw fundings was to finance the acquisition of "Eligible Receivables" meeting the facility's Eligibility Criteria and borrowing base tests, including medical receivables, pre-settlement receivables, private seller-financed mortgage notes, and structured settlements. Consistent with that purpose, Haymarket funded incremental draws of approximately **$14.19 million** on October 21, **$5.05 million** on October 25, **$1.01 million** on October 26, **$4.04 million** on October 28, **$6.06 million** on November 22, and **$10.1 million** on November 28. These disbursements reflected a concentrated mobilization of ModCo-sourced capital rather than ordinary portfolio activity.

87.    During this same period, Leadenhall increased its direct involvement in the administration and oversight of the structured-settlement collateral underlying its facilities. While Haymarket was funding repeated Med Set draws from October through November 2022, Leadenhall engaged in active monitoring of collateral status, pledge priority, and portfolio composition within the 777 structure.

88.    On November 7, 2022, in the middle of the Med Set upsize and weeks before Leadenhall received payment, Leadenhall conducted an in-person, on-site review of MPFin, the software system used by 777 to track structured-settlement collateral and pledge priority. Haymarket is informed and believes that Leadenhall accessed MPFin using credentials associated with a 777 employee and thereby obtained visibility into file-level pledge data, including which receivables were reflected as pledged, to whom, and in what priority order. Through that access,

Leadenhall had the ability to review collateral status and portfolio composition while ModCo-sourced liquidity was being mobilized through Med Set.

89.     Based on sources and uses and other financial records, Haymarket is also informed and believes that, on November 29, 2022, one day after Haymarket funded a $10.1 million Med Set draw, Leadenhall received a matching capital injection of $10 million. In addition, on December 1, 2022, SPLCSS wired a series of payments totaling $2,263,839.91 to pay down outstanding amounts owed on the structured settlement facility.

90.     As a result, Leadenhall used Haymarket's funding to obtain payment and reduce its own exposure, without disclosing that the proceeds were being diverted or that Eligible Receivables were not being acquired as required. Haymarket would not have advanced the funds had it known that Leadenhall was using Haymarket's capital to patch shortfalls in its structured-settlement facilities, which were designed to be self-contained and serviced through collections on settlement receivables rather than funded with Haymarket's ModCo assets.

**K.    Leadenhall Suffers Major Non-777 Losses and Faces Escalating Investor Pressure.**

91.     By late 2022, Leadenhall was not merely facing isolated setbacks, but was confronting a broad and accelerating collapse across multiple flagship investments. Haymarket is informed and believes that the magnitude of those losses triggered acute investor concern and, in at least one instance, led a major Canadian pension fund to withdraw the remaining portion of a $300 million commitment, materially destabilizing Leadenhall's capital base at a critical moment.

92.     Based on communications involving 777 employees, Haymarket is informed and believes that, as of year-end 2022, Leadenhall carried $650 million in exposure across four major non-777 platforms, each of which was being internally positioned as stable, monetizable, or on a path to exit. In reality, each of those platforms soon entered bankruptcy, regulatory seizure, or

controlled wind-down, resulting in material impairment relative to the values Leadenhall was carrying and communicating to investors.

93.     The scale and concentration of these losses placed Leadenhall under acute pressure. Among the most significant failures were: (i) Reverse Mortgage Investment Trust and Reverse Mortgage Funding, where Leadenhall asserted more than $230 million in purportedly secured claims following a November 2022 bankruptcy, only to see the core servicing asset seized by a federal agency[3]; (ii) Friday Health Plans, an Affordable Care Act insurer in which Leadenhall had approximately $200 million of exposure before multi-state regulatory liquidation in 2023[4]; (iii) Hi.Q, a Medicare Advantage commission-receivables platform with roughly $75 million of Leadenhall exposure that entered Chapter 7 liquidation[5]; and (iv) Integrity Australia, a life-insurance platform carrying Leadenhall capital that ultimately lost its license and entered runoff[6]. Taken together, these investments reflect a pattern of underwriting failures, capital-intensive platforms, and impaired exits that left Leadenhall facing hundreds of millions of dollars in unrealized and realized losses.

94.     These losses were not theoretical or remote. By late 2022 and into 2023, they had begun to crystallize through bankruptcies, regulatory interventions, and forced wind-downs, drawing heightened scrutiny from Leadenhall's investors and counterparties. At that point, acknowledging additional impairment, particularly impairment tied to the 777 relationship and the

---

[3] *See In re Reverse Mortgage Investment Trust Inc. and Reverse Mortgage Funding LLC*, Case No. 22-11225-MFW (Bankr. D. Del. Nov. 30, 2022).

[4] *See* Steve Evans, *Leadenhall Leads Equity Raise for Health Insurer Friday, Provides $50m Debt,* Artemis (May 26, 2022); Tyler Hammel & Kris Elaine Figuracion, *Friday Health Plans Collapse Caused by Rapid Growth, Unsustainable Pricing*, S&P GLOBAL MKT. INTELLIGENCE (June 8, 2023).

[5] *See In re Hi.Q, Inc.*, Case No. 23-11361-MFW (Bankr. D. Del. Aug. 30, 2023)

[6] *See* Leadenhall Invests in Australian Life Insurer Integrity Group, Artemis (Jan. 16, 2018); Jamie Williamson, *Integrity Life to Cease Writing New Retail Policies*, INSURANCE INSIDER (Sept. 5, 2023).

collapsing structured-settlement collateral base, would have compounded an already destabilizing narrative for Leadenhall's funds.

95.    Against that backdrop, Haymarket is informed and believes that, beginning in late 2022, Leadenhall adopted an initial strategy of actively concealing additional losses tied to its 777 exposure, rather than disclosing them to investors and the public. During that period, Leadenhall pursued extraordinary measures to extract capital—even at the expense of other creditors—and sought to preserve the appearance of stability by tolerating inflated valuations, elevated leverage, asset reshuffling, and upstream capital diversions within the 777 structure.

96.    At the same time, Leadenhall remained deeply embedded in the governance of 777 Re and Brickell while aware of serious allegations concerning the integrity of the collateral securing its facilities. Members of Leadenhall's senior leadership, including Wells, Craig Gillespie and Phil Kane, continued to attend board and board-update meetings at Brickell and 777 Re in late 2022 and early 2023 alongside Josh Wander and Steven Pasko. Those meetings addressed liquidity stress, capital adequacy, regulatory oversight by the Bermuda Monetary Authority, affiliate transactions, and refinancing strategy. Throughout this period, Leadenhall received board materials, financial reporting, and governance updates confirming the platform's mounting distress and Leadenhall's direct access to decision-makers.

97.    Yet even while participating in these meetings with Wander, Pasko and their former colleague Dan Knipe, Haymarket is informed and believes that Leadenhall deliberately refrained from escalating the anonymous allegations to the board, initiating any official inquiry, or reporting the issues to authorities. Leadenhall also concealed the truth from A-CAP and Haymarket.

98.    Instead of investigating the warning it had received, Leadenhall continued to press for covenant modifications, policy revisions, and de-risking measures designed to insulate its own

exposure. In doing so, Leadenhall set the allegations aside and apparently intended to gamble on the issues not coming to light, thereby prioritizing self-protection over transparency. That calculated inaction persisted for months, until it received information from another lender, Solutions Inc. ("Credigy"), that made continued avoidance untenable.

**L.    Leadenhall Confronts Wander and Pivots Toward Haymarket's Senior Collateral.**

99.    In March 2023, Credigy contacted Leadenhall and provided data demonstrating that approximately $185 million in receivables included in Leadenhall's borrowing base were in fact pledged to Credigy and allocated to Credigy's financing facility. This disclosure confirmed that the receivables failures were not isolated errors, but systemic defects—consistent with warnings Leadenhall had already received months earlier.

100.    With the cat out of the bag, Leadenhall's leadership, including Chairman John Wells, finally decided to confront Josh Wander and participated in recorded calls with him in March and April 2023. By that point, Leadenhall had been meeting with Wander and Pasko regularly for nearly a year and had full board-level access to 777 Re and Brickell. Haymarket is informed and believes that Leadenhall did not approach these calls with Wander as a victim uncovering newly discovered misconduct, but instead as a creditor seeking a way to reach beyond its impaired collateral and into Haymarket's perfected, senior secured HoldCo position to cure Leadenhall's own shortfalls.

101.    On a recorded April 2023 call attended by senior Leadenhall executives and board members—including Wells—Wander acknowledged serious irregularities in collateral acquisition, explaining that "some of the collateral may have ended up actually getting funded," while in other cases a 777 borrower "bought a subset of the collateral and didn't intend to buy the rest of it."

Those admissions crystallized how incomplete asset purchases and transfers had left Leadenhall's borrowing base riddled with defects.

102.    During the same conversation, Wander confirmed that Haymarket held a perfected, senior, all-assets lien at the 777 Partners and 600 Partners holding company level. At that point, the focus of the discussion shifted abruptly. Rather than probing the scope of missing receivables or addressing double-pledging, Leadenhall's questions turned to how it could access, encumber, or otherwise benefit from the assets securing Haymarket's senior position.

103.    Wells immediately pressed: "Will you give us a second lien on all of those assets?" When Wander responded that any such pledge would be subject to Haymarket's rights, Wells persisted, requesting the covenants and terms of Haymarket's facility so Leadenhall could make its "own judgment on how likely any of that cash is to come to us." The exchange underscored that Leadenhall's objective was not to investigate wrongdoing, but to capture value by subordinating or diverting recoveries away from Haymarket.

104.    Wells then went further, suggesting that 777 deliberately use the HoldCo Loan to repay Leadenhall because the interest rate under the HoldCo Loan was "cheaper than the ticking fee" accruing under Leadenhall's loan. In doing so, Wells openly advocated using Haymarket's senior secured capital—intended to protect Haymarket—to bail out Leadenhall's impaired exposure.

105.    When Wander attempted to redirect the discussion toward curing Leadenhall's facility, Wells made Leadenhall's posture explicit: "Yeah, but squeaky wheels are the ones that get oiled." The remark encapsulated Leadenhall's strategy to apply pressure to extract value from the HoldCo Loan once its own collateral failures could no longer be concealed.

**M.    Leadenhall Conceals Known Fraud While Targeting the HoldCo Loan for Recovery.**

106.    Following the April 3, 2023 call, Leadenhall shifted its focus from uncovering the missing receivables to securing a pathway into Haymarket's perfected senior-secured position as the means of shielding itself from escalating losses in its 777-linked facilities. Rather than addressing the proven defects in its own collateral base, Leadenhall identified Haymarket's lien as the most direct route to recovery.

107.    On June 16, 2023, 777's in-house counsel proposed to Leadenhall's Craig Gillespie that, "because of the way the various pieces of the ACAP loan are structured, the simplest way to [] accomplish the ask is for 777 to grant Leadenhall a 'springing lien' on all assets of 777 that takes effect once all ACAP obligations are retired." This proposal explicitly recognized Haymarket's senior lien as the priority claim to the HoldCo collateral and positioned Leadenhall to step into that claim.

108.    Gillespie responded within minutes that Leadenhall was "aware of many other parental guarantees that exist and a key objective here is to put the Leadenhall claim ahead of those." The goal was not to protect the broader creditor body—it was to improve Leadenhall's relative position.

109.    A few days later, Leadenhall again acknowledged Haymarket's senior secured position when it asked A-CAP to convene meetings to discuss "2nd/3rd lien and intercreditor documents," expressly noting that Leadenhall was under investor pressure to finalize an agreement before June 30.

110.    A-CAP, acting in good faith on behalf of Haymarket and under the belief that all parties were working toward commercially reasonable outcomes, confirmed it was "willing to consider the 4th lien" and authorized Leadenhall to review its loan agreements. At no point did

Leadenhall disclose the September 2022 anonymous tip regarding 777's double-pledging of collateral, Credigy's March 2023 confirmation of a $185 million receivables misallocation, or Wander's April 2023 recorded admissions—all facts that directly bore on the prudence of granting Leadenhall any lien access to the HoldCo Loan collateral.

111.    That cooperative posture continued into the fall. By September 2023, Leadenhall was reaching out to Haymarket and A-CAP to discuss 777's liquidity needs and wrote that resolving "the situation we are facing with our mutual client" required coordinated lender dialogue.

112.    Throughout this period, Leadenhall consistently framed the problem as a commercial "situation" or "deficit"—never as a fraud-driven collateral disappearance—even though its senior leadership already knew that receivables were missing, double-pledged, or never purchased.

**N.    Leadenhall Proposes a Cayman Structure While Concealing Double-Pledged Collateral.**

113.    By October 2023, Leadenhall escalated its tactics in an effort to compensate for its undersecured and junior position. At that point, Leadenhall was struggling to recover losses in non-777 bankruptcies and was under increasing pressure from its investors. As a result, Leadenhall intensified its efforts to shift the consequences of its own collateral failures onto Haymarket and A-CAP.

114.    On October 12, 2023, Leadenhall urged A-CAP to inject new capital through a Cayman-domiciled investment vehicle that would be structured, controlled, and managed by Leadenhall itself. Under the proposal, A-CAP, through its insurance company affiliates (including Haymarket), would supply the funding, while Leadenhall would use the vehicle to "purchase or refinance" certain Sutton Park–related notes held in Leadenhall's own facilities.

115.    In presenting the proposal, Leadenhall represented that the notes to be refinanced were "for all intents and purposes structured to be fully backed by structured-settlement receivables." In reality, as Leadenhall senior leadership—including Wells—already knew, substantial portions of the purported collateral were missing, had been double-pledged to other lenders, or were otherwise materially impaired.

116.    Rather than disclose those defects, Leadenhall proposed to re-tier the repackaged notes into senior and junior tranches. Although A-CAP would nominally occupy the "senior" tranche, the structure would in substance assign to A-CAP the risk of non-collateralized or fraud-tainted receivables, while allowing Leadenhall to retain its economics, control rights, and fee streams without surrendering upside.

117.    The Cayman proposal was not a balanced or good-faith restructuring. It was an effort to offload a known collateral shortfall and to convert A-CAP into the party bearing the very fraud risk Leadenhall now alleges in this action—without disclosing what Leadenhall already knew about missing, never-purchased, or double-pledged receivables.

118.    Even without knowing the true picture, A-CAP recognized that the deal did not make sense and rejected it. The Cayman structure served no legitimate senior-secured lending objective, and A-CAP rejected it outright.

**O.    Leadenhall Escalates Pressure Through Media Leaks After Its Proposal Fails.**

119.    A-CAP's rejection of Leadenhall's Cayman Islands proposal marked a turning point. Having failed to induce A-CAP to absorb Leadenhall's known collateral defects through a privately negotiated restructuring, Leadenhall escalated its pressure campaign. With its structured-settlement facilities impaired, its Brickell and 777 Re exposure under strain, and its year-long

concealment of missing and double-pledged collateral increasingly difficult to sustain, Leadenhall sought leverage outside the negotiating room.

120.    That escalation surfaced immediately. On October 17, 2023, five days after A-CAP rejected the Cayman proposal, an article appeared on an obscure Norway-based blog called Josimar (josimarfootball.com).[7] Although Josimar had previously published articles concerning 777 Partners, this piece marked a sharp shift in focus and tone. It targeted A-CAP and its chairman and CEO, Kenneth King, personally, by employing insinuation, selective disclosure, and highly personal attacks to portray A-CAP as the source of 777's financial distress, while omitting Leadenhall's own role in enabling, monitoring, and ignoring the deterioration of the collateral securing its loans.

121.    The following day, October 18, 2023, A-CAP received an inquiry from The New York Times containing a highly specific and insider-informed set of questions that tracked the same themes Leadenhall was advancing internally and through intermediaries. The inquiry was accusatory in tone and assumed impropriety rather than seeking objective explanation—before A-CAP had been the subject of any adverse press. One question in particular was revealing: "Why did 777 provide a mortgage to A-Cap or an A-Cap executive?" That framing reflected targeted leakage designed to inflict reputational harm and apply external pressure at the precise moment Leadenhall knew A-CAP had refused to capitulate.

---

[7] Norwegian press regulators have repeatedly found that Josimar violated core journalistic ethics. In at least three adjudicated decisions between 2019 and 2020, the Norwegian Press's Professional Committee (Pressens Faglige Utvalg, "PFU") held that Josimar published serious allegations without adequate verification, failed to provide simultaneous rebuttal, appended polemical commentary to responses, and mishandled confidential sources, in violation of multiple provisions of the Norwegian Code of Press Ethics (Vær Varsom-plakaten). These documented failures mirror the same defects present in Josimar's reporting on A-CAP and its affiliates, including reliance on unverified assertions and omission of material contextual facts.

**P.    Leadenhall Misrepresents Long-Known Collateral Failures as New Discoveries.**

122.    Even after escalating pressure through targeted media attacks, Leadenhall continued to conceal what it already knew. Throughout October and into November 2023, Leadenhall circulated borrowing-base analyses to A-CAP that framed the problem as a valuation-driven "shortfall" or "deficit," not as fraud, double-pledging, or missing collateral.

123.    On October 18, 2023, Gillespie emailed A-CAP a table calculating a purported $204.4 million "collateral shortfall" across Dorchester, Sutton Park, and Insurety, while simultaneously representing that the collateral still had an aggregate value of approximately $295.6 million. The communication made no reference to missing assets, defective purchases, or double pledges.

124.    That framing persisted through November. Leadenhall repeatedly thanked A-CAP for exploring "solutions" and attributed the deficit to interest-rate sensitivity and market volatility—language that obscured the known collapse of collateral integrity and preserved the false impression that the facilities remained fundamentally sound.

125.    On November 8, 2023, while Leadenhall continued to characterize the situation to A-CAP as a market-driven "shortfall," employees of 777 exchanged internal text messages reflecting that Leadenhall was already aware of pervasive collateral failures, including double pledging. One employee stated, "**Yea it's bad. I've told Leadenhall all**." Another responded, "**All of what? The double pledging? I thought they knew already**." The reply confirmed that Leadenhall personnel had discussed the issue openly: "**yeah they made jokes about double pledging at lunch today**." When asked, "How can they joke about that. Don't people go to jail for doing that?", the response was blunt: "**they're [expletive]. so many losses in their portfolio. 777 probably next**."

126.    Although Leadenhall personnel was apparently joking about the double pledging in offline communications with 777, Leadenhall continued to string Haymarket along and not disclose anything. That changed on November 21, 2023 when Leadenhall pretended to discover issues with its collateral. In an email to 777, Gillespie demanded "full evidence of existence and eligibility" of receivables and, after reviewing a pro forma borrowing-base report, accused the borrowers of including receivables that were "not good or eligible," expressly identifying assets that were "[d]ouble pledged," "[n]ever purchased," or sold without proceeds being applied to Leadenhall's facilities.

127.    That display of sudden discovery was false and intended to mislead Haymarket. By November 21, Leadenhall had already received the September 19, 2022 anonymous fraud tip, obtained Credigy's March 2023 analysis identifying approximately $185 million in misallocated collateral, and heard recorded admissions by Wander in March and April 2023 regarding incomplete purchases and double-pledging.

128.    Leadenhall disclosed none of this to Haymarket or A-CAP. Instead, it concealed known fraud for more than a year, mischaracterized a collapse of collateral as a market "shortfall," and only claimed discovery once its pressure campaign failed and litigation became inevitable.

Q.    **Leadenhall Converts Its Pressure Campaign Into Litigation and Emergency Motions.**

129.    Having failed to force Haymarket and A-CAP into concessions through restructuring proposals, selective disclosure, and media pressure, Leadenhall pivoted to litigation. On May 3, 2024, Leadenhall filed a lawsuit against several defendants, including 777 Partners, 600 Partners, A-CAP, and Kenneth King in the Southern District of New York (*Leadenhall Capital Partners LLP, et al. v. Wander, et al.*, No. 1:24-cv-03453 (S.D.N.Y.)) and immediately sought

emergency relief, including a sweeping temporary restraining order and preliminary injunction, premised on claims of sudden discovery, imminent harm, and urgent need for court intervention.

130.    The TRO application recycled the same narrative Leadenhall had been advancing behind the scenes for months—that A-CAP was responsible for a supposed crisis driven by collateral "shortfalls" and improper influence over 777. What Leadenhall portrayed as emergency discovery was, in reality, the endpoint of prolonged concealment and a calculated effort to obscure its own diligence failures and role in the collapse of the collateral base.

131.    The media campaign did not end. To the contrary, it accelerated in lockstep with the litigation, as the same outlet recycled Leadenhall's allegations and amplified its pleadings— portraying A-CAP as the architect of 777's distress and Leadenhall as an unwitting victim—and reinforcing reputational pressure designed to shape the backdrop against which the court was asked to assess claims of irreparable harm. Consistent with that strategy, Leadenhall cited Josimar articles no fewer than eighteen times across court filings, quoting the same media narratives as if they provided independent corroboration of Leadenhall's claims.

**R.    Leadenhall Forecloses on Its Own Collateral for $3 After Previously Stating Its Value at Over $250 Million.**

132.    After obtaining injunctive relief on the premise that its collateral was worth hundreds of millions of dollars and at imminent risk of dissipation, Leadenhall did the opposite of what it told the court in *Leadenhall Capital Partners LLP, et al. v. Wander, et al.* was necessary: It quietly disposed of that same collateral for a nominal amount. This conduct confirms that Leadenhall's injunction narrative was not merely exaggerated—it was false.

133.    On or about May 1, 2025, Leadenhall issued notices of a UCC foreclosure sale covering substantially all remaining collateral under the May 7, 2021 Loan and Security Agreement, including the assets of Signal, Dorchester, and Sutton Park.

134.    The foreclosure was conducted without notice to Haymarket or A-CAP, without public advertising, and without any commercially reasonable effort to solicit bids. It was scheduled inside Leadenhall's counsel's offices, provided no meaningful collateral descriptions, and was structured to ensure that no third party could participate.

135.    On May 15, 2025, with no competing bidders present, Leadenhall submitted a single credit bid of $3 for assets it had repeatedly represented—to A-CAP and to the court in *Leadenhall Capital Partners LLP, et al. v. Wander, et al.*—as having an aggregate value exceeding $200 million.

136.    Those representations were not historical artifacts. As late as October 2023, Leadenhall circulated borrowing-base calculations valuing Dorchester, Sutton Park, and Signal receivables in the tens of millions of dollars each, while asserting that the collateral remained substantial but subject to a "shortfall." None of those valuations were withdrawn before the foreclosure.

137.    Leadenhall cannot reconcile these positions. Collateral cannot simultaneously be worth hundreds of millions of dollars for purposes of securing an injunction and worth three dollars for purposes of foreclosure. One of those representations is false.

138.    The foreclosure resolves the contradiction. Leadenhall did not act as a lender seeking to preserve valuable collateral; it acted as a litigant who knew its injunction story could not survive exposure to a market test.

139.    By foreclosing in secret for a nominal amount while continuing to rely on inflated collateral valuations in court, Leadenhall demonstrated that its claims of imminent harm, collateral value, and need for equitable relief were knowingly untrue. The foreclosure confirms what the contemporaneous record already shows: Leadenhall misrepresented the condition and value of its collateral to obtain leverage, not protection.

140.    This conduct forms part of the same course of dealing in which Leadenhall has acted in bad faith, concealed material information from Haymarket and A-CAP, and interfered with Haymarket's senior rights by manipulating collateral status to suit its own strategic objectives without regard to commercial reasonableness or creditor equality. Haymarket is informed and believes, and therefore alleges, that Leadenhall timed the foreclosure to coincide with pending appellate proceedings over the injunction's scope, concealing its true intent to eliminate the collateral while maintaining the restraints. The process was orchestrated to suppress price discovery, avoid creditor competition, and obstruct Haymarket's senior lien rights—continuing the pattern of concealment, self-help, and interference described above.

## COUNT I
### FRAUD
### (Against All Defendants)

141.    Haymarket repeats and realleges each of the foregoing allegations as if fully set forth herein.

### Material Misrepresentations and Omissions

142.    Between at least October 2021 and December 2022, Leadenhall Capital, Leadenhall Life, and Wells engaged in a course of fraudulent concealment and misrepresentation directed at Haymarket, acting directly and through A-CAP, concerning the integrity of collateral securing Leadenhall-managed facilities and the true sources and uses of funds flowing through the 777 enterprise.

42

143.    During that period, Defendants knowingly concealed and failed to disclose material facts, including that substantial portions of receivables purportedly securing facilities governed by the Leadenhall LSA:

   a.    Had never been purchased;

   b.    Had been double-pledged to other lenders; or

   c.    Otherwise did not exist as enforceable collateral.

144.    Defendants further concealed that borrowing-base deficiencies and liquidity stress within Leadenhall-managed facilities were not temporary valuation "shortfalls," but instead reflected fundamental breakdowns in collateral integrity caused by incomplete asset acquisition, defective assignments, and double pledging.

145.    Defendants' omissions were materially misleading because, during the same period, Defendants knowingly caused or accepted payments and paydowns funded directly or indirectly with proceeds of the HoldCo Loan and ModCo assets, while failing to disclose that those funds were being diverted to cure Leadenhall's own impaired lending positions rather than applied in accordance with the HoldCo Loan, the Reinsurance Agreement, and the loan documents governing the Med Set transaction.

**Advance and Contemporaneous Knowledge of Haymarket Transactions**

146.    Before the Reinsurance Agreements and the HoldCo Loan closed, Leadenhall, acting through Wells, his partners, and other senior principals at Leadenhall Capital, received advance, non-public information concerning those transactions as part of board-level updates and governance communications at Brickell and 777 Re.

147.    Leadenhall's board-observer and information rights at Brickell and 777 Re were not limited to retrospective monitoring. Through those rights, Leadenhall received pre-closing

updates regarding contemplated reinsurance arrangements, capital structure changes, liquidity planning, and upstream financing initiatives, including the proposed terms, timing, and strategic purpose of Haymarket's reinsurance participation and holding-company financing.

148.    As a result, before Haymarket committed capital, Defendants understood that:

a.    Haymarket's Reinsurance Agreements would place ModCo assets in a dedicated account legally held by Haymarket but economically attributable to 777 Re;

b.    Haymarket's HoldCo Loan would provide senior-secured, first-priority financing at the holding-company level, subject to strict use-of-proceeds and anti-diversion protections; and

c.    Both transactions would materially increase liquidity available within the 777 structure while contractually prioritizing Haymarket's senior rights.

149.    Defendants did not disclose to Haymarket that, at the time those transactions were being planned and approved, Defendants were already aware of persistent deficiencies in receivable acquisition, documentation, and pledge integrity within Leadenhall-managed facilities, that Leadenhall's own exposure depended on access to external liquidity, and that they would be using Haymarket's funds, in violation of negative covenants and restrictions on use, to divert capital to its own facilities to cover shortfalls and payoff short term bridge loans that it extended from 2021 through 2023.

150.    Moreover, in September 2022, Craig Gillespie at Leadenhall received an anonymous tip expressly warning that receivables pledged by 777 did not exist, had been double-pledged, or were tied to criminal activity. Defendants did not disclose the existence or substance of that warning to Haymarket, did not initiate an independent investigation, and did not elevate the

issue through governance channels available to them through board-observer and information rights at Brickell and 777 Re. Instead, Defendants continued to present the deterioration of Leadenhall-managed facilities as a market-based issues involving fluctuating interest rates and other economic factors, while concealing known indicators of fraud that directly bore on Haymarket's senior secured position and on whether Haymarket's capital was being misused.

**Scienter**

151.    Defendants acted knowingly and with intent to defraud, or at minimum with conscious recklessness as to the truth and falsity of their omissions.

152.    Defendants' actual knowledge is established by, among other things:

      a.      Leadenhall's long-standing, embedded role as lender, agent, and active manager of 777-affiliated receivables facilities beginning in 2016;

      b.      Leadenhall's board-observer and information rights at Brickell and 777 Re, through which it received advance and contemporaneous non-public reporting concerning capitalization, liquidity, refinancing strategy, and upstream financing—including Haymarket's proposed transactions;

      c.      Defendants' receipt, in September 2022, of an anonymous warning that receivables pledged by 777 did not exist, had been double-pledged, or were tied to criminal activity; and

      d.      Defendants' direct involvement in approving, structuring, and timing draw-and-pay transactions that relied on liquidity sourced from the HoldCo Loan and ModCo assets.

153.    Wells personally directed, authorized, and participated in the fraudulent conduct, including by approving Leadenhall's extraction and retention of payments funded with

Haymarket's senior-secured capital and by exploiting Leadenhall's embedded access within the 777 structure to accelerate Leadenhall's recovery while concealing collateral failures.

**Intent to Induce Reliance**

154.    Defendants intended that Haymarket rely on Defendants' concealment and misrepresentations by continuing to advance and maintain senior-secured financing under the HoldCo Loan, permitting the use and release of ModCo assets, and refraining from taking immediate protective action that would have prevented diversion of Haymarket's capital.

155.    Defendants' fraudulent conduct was designed to ensure that Haymarket remained unaware that its funds were being used to stabilize and repay Leadenhall-managed facilities that were contractually required to be self-contained and serviced through borrower-level collateral and collections.

**Justifiable Reliance**

156.    Haymarket justifiably relied on Defendants' omissions and misleading framing of events by continuing to fund and maintain exposure under the HoldCo Loan and ModCo arrangements without knowledge that its senior-secured capital was being diverted to cure Leadenhall's separate losses.

157.    Haymarket's reliance was reasonable because Defendants possessed superior, non-public information concerning collateral integrity and liquidity within the 777 structure and affirmatively withheld that information while accepting and retaining payments sourced from Haymarket's capital.

**Causation and Damages**

158.    Defendants' fraud was a direct and proximate cause of Haymarket's injuries.

159.    As a result of Defendants' concealment and misrepresentations prior to January 2023, Haymarket suffered damages including, without limitation:

     a.    More than $35 million in unauthorized HoldCo Loan proceeds diverted between October 2021 and May 2022;

     b.    More than $30 million in paydowns on Leadenhall-managed structured-settlement facilities funded through the June 30, 2022 HoldCo Loan draw; and

     c.    An additional $10 million payment extracted in November 2022 through the Med Set transaction sequence funded with ModCo assets.

160.    In total, Haymarket has suffered damages of at least $75 million as a result of Defendants' fraudulent conduct.

**Joint and Several Liability**

161.    Defendants acted in concert and as part of a unified scheme. Wells exercised control over Leadenhall Capital and Leadenhall Life and personally directed the conduct giving rise to this claim. Accordingly, Defendants are jointly and severally liable for Haymarket's damages.

**<u>COUNT II</u>**
**AIDING AND ABETTING FRAUD**
**(Against All Defendants)**

162.    Haymarket repeats and realleges each of the foregoing allegations as if fully set forth herein.

163.    At all relevant times, non-party 777 and 600 Partners, and their controlling principals Joshua Wander and Steven Pasko, engaged in a scheme to defraud Haymarket by knowingly misrepresenting and concealing material facts concerning the existence, ownership, and

lien status of receivables and other assets purportedly pledged to secure financings involving Haymarket, including assets that were never purchased, were double-pledged, or did not exist.

164.    777 and 600 Partners, and their controlling principals Joshua Wander and Steven Pasko, made these misrepresentations and omissions to induce Haymarket to advance and maintain senior-secured financing under the HoldCo Loan and to permit the use and release of ModCo assets, while concealing mounting collateral deficiencies and liquidity shortfalls within the 777 enterprise.

165.    As detailed above, Leadenhall Capital and Leadenhall Life, acting at the direction of Wells, had actual knowledge of this fraud and the relevant restrictions on use of funds in the HoldCo Loan and Reinsurance Agreements while it was ongoing.

166.    Leadenhall's actual knowledge is established by, among other things:

> a.    Its long-standing, embedded role as lender, agent, and active manager of 777-affiliated receivables facilities beginning in 2016 and continuing through 2025;
>
> b.    Its board-observer and information rights at Brickell and 777 Re, through which Leadenhall received non-public financial reporting, governance materials, and liquidity updates; and
>
> c.    Its receipt, in September 2022, of an anonymous tip expressly warning that receivables and other collateral pledged by 777 did not exist, had been double-pledged, or were tied to criminal activity.

167.    Despite this knowledge, Leadenhall did not disclose the fraud to Haymarket. Instead, facing mounting losses across other investment platforms and increasing pressure to generate liquidity and demonstrate recoveries, Leadenhall substantially assisted 777 and 600

Partners, and their controlling principals Joshua Wander and Steven Pasko, by affirmatively enabling, concealing, and exploiting the fraud to accelerate repayments to Leadenhall and shift losses onto Haymarket.

168.    Leadenhall's substantial assistance included, without limitation:

a.    Concealing known collateral failures and fraud indicators from Haymarket during negotiations concerning lien restructurings, intercreditor arrangements, and refinancing proposals;

b.    Continuing to accept and retain repayments and paydowns funded directly or indirectly with proceeds of the HoldCo Loan and ModCo assets, knowing those funds were subject to Haymarket's perfected senior security interests and contractual limitations under the HoldCo Loan;

c.    Leveraging its influence over 777's principals and its board-level access to induce draw-and-pay transactions that diverted Haymarket's capital to satisfy Leadenhall-managed obligations;

d.    Participating in and approving the June 30, 2022 refinancing and contemporaneous HoldCo Loan draw that enabled Leadenhall to receive more than $30 million in paydowns while concealing the failure of its own collateral base; and

e.    Extracting an additional $10 million payment in November 2022 following the Med Set upsize, funded with ModCo assets, after Leadenhall had reason to know that collateral defects and double pledging were pervasive.

169.    Wells is liable as an aider and abettor because he personally directed, authorized, and participated in Leadenhall's conduct, including advocating for the use of HoldCo Loan funds

to repay Leadenhall obligations, approving the timing and structure of draw-and-pay transactions, and exploiting Leadenhall's board-level access to advance Leadenhall's recovery at Haymarket's expense.

170.    Leadenhall's conduct was a substantial factor in enabling the fraud of 777 and 600 Partners, and their controlling principals Wander and Pasko, and in causing Haymarket's injury. Without Leadenhall's knowing concealment, coordination, and knowing diversion of funds from lending facilities that were to benefit other entities within the 777-entity structure and secured by separate collateral, the scheme could not have succeeded.

171.    As a direct and proximate result of Leadenhall and Wells' aiding and abetting of fraud, Haymarket has suffered damages in an amount to be proven at trial, including at least $75 million representing senior-secured capital wrongfully diverted, together with prejudgment interest, costs, and other relief permitted by law.

**COUNT III**
**TORTIOUS INTERFERENCE WITH CONTRACT**
**(Against All Defendants)**

172.    Haymarket repeats and realleges each of the foregoing allegations as if fully set forth herein.

173.    The HoldCo Loan is a valid and enforceable contract between Haymarket and 777 and 600 Partners. The HoldCo Loan includes covenants and payment provisions designed to protect Haymarket's senior secured position, including restrictions on use of proceeds, restrictions on prohibited transfers and value leakage, mandatory prepayment provisions, and limitations on additional indebtedness and liens, except as expressly permitted.

174.    Haymarket performed its obligations under the HoldCo Loan, including by extending credit and funding advances in accordance with its terms.

175.    Defendants are not parties to the HoldCo Loan and are not intended third-party beneficiaries of the HoldCo Loan. Defendants had no contractual right to receive proceeds of 600 and 777 Partners' assets in a manner that violated the HoldCo Loan's restrictions or impaired Haymarket's senior secured position.

176.    Defendants had actual knowledge of the HoldCo Loan and Haymarket's senior secured position, including through Defendants' dealings with A-CAP and 777, Defendants' board-level access and information rights at 777 Re and Brickell, and communications beginning in 2021 with Wander and Pasko acknowledging Haymarket's perfected senior lien at the holding-company level.

177.    Based on sources-and-uses materials and related financial records provided by 777, Haymarket is informed and believes, and on that basis alleges, that beginning no later than October 2021, Leadenhall, acting at the direction of Wells, intentionally and knowingly caused 600 and 777 Partners to draw and divert proceeds of the HoldCo Loan to satisfy obligations under the Leadenhall LSA and the Brickell Term Loan. With respect to the Leadenhall LSA, the credit facility was extended to, and the purported collateral was owned by, separate special-purpose borrower entities, not by 600 or 777 Partners. 600 and 777 Partners were not borrowers, collateral owners, or primary obligors under that facility.

178.    Despite the absence of any secured obligation, direct borrowing, or corresponding economic benefit to 600 Partners LLC or 777 Partners LLC, Leadenhall deliberately caused those entities to breach the HoldCo Loan by diverting HoldCo loan proceeds to satisfy the debts of downstream special-purpose borrowers under Leadenhall-managed facilities. Leadenhall did so without exercising contractual remedies against the pledged collateral and without regard to the separate legal existence of the borrower entities that purportedly owned that collateral.

179.    Instead, Leadenhall treated 600 and 777 Partners as a readily available liquidity source, commandeering HoldCo Loan funds to backstop and cure Leadenhall's impaired lending positions. Leadenhall further concealed this diversion and misuse of HoldCo Loan funds from Haymarket, withholding material information concerning the sources and uses of funds and the true purpose of the payments in order to prevent detection and to avoid scrutiny by Haymarket. This conduct constituted a knowing and intentional violation of the HoldCo Loan's express prohibitions on use of proceeds, intercompany transfers, and upstream payments.

180.    For example, between October 2021 and May 2022, Leadenhall, acting at the direction of Wells, caused 600 and 777 Partners to divert more than $35 million in HoldCo Loan proceeds for the purpose of paying down Leadenhall-managed facilities, including facilities governed by the Leadenhall LSA, rather than applying those proceeds in compliance with the HoldCo Loan.

181.    On or about June 30, 2022, Defendants, acting at the direction of Wells, again intentionally and knowingly procured and induced 600 and 777 Partners to breach the HoldCo Loan by causing a HoldCo Loan draw exceeding $50 million to be used, directly and indirectly, to fund paydowns exceeding $30 million on Leadenhall-managed structured-settlement facilities, including payments to SPLCSS II, Signal, and Insurety, despite Defendants' knowledge that those facilities were borrower-level facilities and that this interfered with and breached contract limitations protecting Haymarket's senior secured rights at the holding-company level.

182.    Defendants' procurement and inducement were accomplished through wrongful means independent of the HoldCo Loan, including by exploiting Defendants' inside access and leverage within 777, concealing known indicators of missing or double-pledged collateral within Defendants' own collateral base while presenting the crisis to Haymarket and A-CAP as a

temporary "shortfall," and knowingly accepting and retaining transfers funded with proceeds subject to Haymarket's senior secured rights.

183.    Defendants' conduct was intentional and was undertaken to secure an improper economic advantage—accelerated liquidity and paydowns for Defendants' benefit—at Haymarket's expense.

184.    As a direct and proximate result of Defendants' tortious interference with the HoldCo Loan, Haymarket has suffered damages in an amount to be proven at trial, including at least $65 million consisting of the diverted HoldCo Loan proceeds described above, together with prejudgment interest.

<u>**COUNT IV**</u>
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against All Defendants)**

185.    Haymarket repeats and realleges the foregoing allegations as if fully set forth herein.

186.    At all relevant times, Haymarket held valid, perfected, first-priority security interests in substantially all assets of 777 Partners and 600 Partners, including investment property, equity interests, accounts, general intangibles, deposit accounts, and proceeds thereof, pursuant to the HoldCo Loan.

187.    Haymarket perfected those security interests through UCC filings and related instruments. The HoldCo Loan further provided that unauthorized transfers, misuse of proceeds, or incurrence of prohibited indebtedness constituted events of default, upon which Haymarket held an immediate superior right of possession and control over the collateral and its identifiable proceeds.

188.    Leadenhall, acting at the direction of Wells, knowingly exercised unauthorized dominion and control over Haymarket's collateral and proceeds by causing, inducing, accepting, and retaining payments funded with Haymarket's senior-secured capital, including proceeds of the HoldCo Loan and assets held in Haymarket's ModCo account.

189.    Between October 2021 and May 2022, Defendants caused 777 to divert more than $35 million in HoldCo Loan draws to pay down Leadenhall-managed facilities, notwithstanding that such transfers violated the HoldCo Loan's use-of-proceeds restrictions, mandatory prepayment provisions, and lien protections.

190.    On or about June 30, 2022, Defendants further caused a HoldCo Loan draw exceeding $50 million to be used, directly and indirectly, to fund a paydown exceeding $30 million on Leadenhall's structured-settlement facilities, including but not limited to payments to SPLCSS II, Signal, and Insurety, despite Defendants' knowledge that those facilities were borrower-level, junior, and not entitled to upstream holding-company proceeds.

191.    In November 2022, Defendants again exercised unauthorized dominion over Haymarket's property by extracting a $10 million payment funded with proceeds from investments held in Haymarket's ModCo account, following a coordinated upsize and draw sequence through the Med Set Funding platform designed to mobilize Haymarket's collateral for Leadenhall's benefit.

192.    At all relevant times, Defendants knew or were on constructive notice of Haymarket's superior security interests, including through direct communications with Haymarket and A-CAP, board-level access and information rights at 777 Re and Brickell, participation in refinancing negotiations, and repeated acknowledgments of Haymarket's senior lien position.

193.    Wells is personally liable because he personally directed, authorized, and participated in the diversion and misuse of Haymarket's collateral and proceeds, including by advocating for use of HoldCo Loan funds to repay Leadenhall obligations, approving draw-and-pay transactions, and exploiting board-level access to extract value for Leadenhall at Haymarket's expense.

194.    As a direct and proximate result of Defendants' conversion, Haymarket has suffered damages not less than $75 million, representing the value of collateral and proceeds wrongfully diverted, together with prejudgment interest, costs, and such other relief as the Court deems just and proper.

### COUNT V
### UNJUST ENRICHMENT
### (Against Leadenhall Capital and Leadenhall Life)

195.    Haymarket repeats and realleges each preceding allegation as if fully set forth herein.

196.    Defendants were enriched at Haymarket's expense by receiving and retaining benefits traceable to the diversion and extraction of Haymarket's senior-secured capital and related value, including (among other things) payments and paydowns alleged to have been funded through HoldCo Loan draws and ModCo-sourced funds.

197.    The enrichment alleged was direct and substantial, including the alleged extraction and retention of more than $75 million of Haymarket's senior-secured capital through concealment, misrepresentations, and diversion schemes carried out by Leadenhall at the direction of Wells and in coordination with 777 principals, as described above.

198.    Defendants' enrichment was fraudulent, opportunistic, and contrary to equity and good conscience. Defendants used their inside access to 777 to engineer repayment of their own

impaired positions from Haymarket's senior-secured capital, while deliberately withholding information that would have prevented Haymarket from being used as the source of that recovery.

199.    Acting at the direction of Wells, Defendants were deeply embedded within the 777 enterprise prior to Haymarket's involvement and had continuous, non-public access to information concerning collateral integrity, borrowing-base stress, liquidity shortfalls, and enterprise-level distress, including through board-observer and information rights at 777 Re and Brickell and direct, ongoing dealings with Wander and Pasko.

200.    With that access, Defendants learned that collateral purportedly securing their facilities was missing, never purchased, or double-pledged, and received an express warning of potential criminal conduct. Rather than investigate, escalate, or disclose those facts to Haymarket, Defendants affirmatively concealed them—declining to initiate an independent review, withholding the warning and its substance, and continuing to pursue restructuring, lien-elevation, and recovery strategies as if the collateral base remained intact.

201.    Having knowledge of those defects, Defendants chose extraction over remediation. Instead of correcting deficiencies within their own borrower-level facilities or absorbing the consequences of their diligence and control failures, Defendants targeted Haymarket's perfected senior-secured position and used their leverage over 777's principals to cause diversions and payments sourced from Haymarket's capital, including unauthorized HoldCo Loan draws, the June 30, 2022 draw applied to pay down Leadenhall exposures, and the ModCo-sourced payment sequence, thereby converting Haymarket's senior collateral into a backstop for Leadenhall's separate losses while keeping Haymarket materially uninformed.

202.    Equity and good conscience require Defendants to disgorge the benefits unjustly obtained and to make restitution to Haymarket.

203.    Haymarket seeks restitution and disgorgement of all unjust benefits received by Defendants, together with such other and further equitable relief as the Court deems just and proper.

**COUNT VI**
**MONEY HAD AND RECEIVED**
**(Against Leadenhall Capital and Leadenhall Life)**

204.    Haymarket repeats and realleges each preceding allegation as if fully set forth herein.

205.    Leadenhall received, possessed, and exercised dominion over specific and identifiable funds that, in equity and good conscience, belong to Haymarket, including discrete payments and paydowns funded from Haymarket's senior-secured capital: unauthorized draws under the HoldCo Loan between October 2021 and May 2022; proceeds of the June 30, 2022 HoldCo Loan draw applied directly to reduce Leadenhall-managed exposures; and the $10 million payment sourced through the ModCo-funded Med Set transaction sequence, as described above.

206.    Leadenhall's receipt and retention of these funds was knowing and intentional, not accidental or mistaken. Leadenhall obtained the money through a coordinated course of concealment and misrepresentation regarding collateral integrity and pledge status, while exploiting their embedded position within the 777 structure to cause Haymarket's funds to be routed upstream and applied for Leadenhall's benefit.

207.    Haymarket did not voluntarily confer these funds on Leadenhall, did not authorize their use to cure Leadenhall's separate losses, and was affirmatively deprived of material information, including known collateral failures and fraud indicators, that would have prevented the transfers. Leadenhall's conduct stripped Haymarket's senior-secured capital of its intended protections and converted it into a source of repayment for Leadenhall.

208.    Under principles of equity and good conscience, Leadenhall cannot retain money obtained in this manner. Permitting retention would ratify a fraud-driven extraction of senior collateral and reward concealment, misuse of control rights, and diversion of funds in derogation of Haymarket's perfected security interests.

209.    Haymarket seeks judgment requiring Leadenhall to repay all such amounts wrongfully received and retained, together with pre- and post-judgment interest, and further seeks restitutionary relief consistent with the imposition of a constructive trust and a full accounting to identify and recover all proceeds, substitutions, and traceable value derived from Haymarket's funds.

**COUNT VII**
**ACCOUNTING**
**(Against Leadenhall Capital and Leadenhall Life)**

210.    Haymarket repeats and realleges each preceding allegation as if fully set forth herein.

211.    Leadenhall exercised exclusive control over the receipt, routing, application, valuation, and disposition of money and assets derived from or pledged in connection with Haymarket's senior-secured capital, including proceeds of HoldCo Loan draws, ModCo-sourced investments, refinancing-related paydowns, and assets foreclosed upon under the May 7, 2021 Loan and Security Agreement.

212.    The matters at issue involve complex, multi-layered financial activity carried out across borrower-level facilities, holding-company structures, investment vehicles, and foreclosure processes that were managed, directed, or controlled by Leadenhall. The full scope of Haymarket's losses and Leadenhall's enrichment cannot be determined without a court-ordered accounting.

213.    Leadenhall possesses or controls material information unavailable to Haymarket, including internal sources-and-uses analyses, draw approvals, payoff instructions, valuation models, borrowing-base calculations, MPFin data, board materials, foreclosure notices, bid analyses, and internal communications reflecting how Haymarket's funds and collateral were treated, valued, diverted, substituted, or disposed of.

214.    An accounting is required to determine, among other things:

a.    The total amount of Haymarket funds diverted, extracted, or applied for Leadenhall's benefit;

b.    The specific transactions through which those funds were routed, including the timing and sequencing of HoldCo Loan draws, refinancing paydowns, and ModCo-sourced payments;

c.    The assets included, excluded, reclassified, or substituted in Leadenhall's asserted collateral base over time;

d.    The valuations assigned to those assets at different stages, including representations made to investors, purchasers, and agents;

e.    The basis and commercial reasonableness of Leadenhall's foreclosure process, including notice, marketing, bidding procedures, and the decision to acquire assets for a nominal credit bid; and

f.    The current status, proceeds, and derivative value of any assets, interests, or benefits retained or sold by Leadenhall following foreclosure or repayment.

215.    Haymarket has no adequate remedy at law to obtain this information absent an accounting. Ordinary discovery is insufficient where Leadenhall structured, controlled, and

executed the transactions and foreclosure process while advancing materially inconsistent positions regarding asset value and collateral integrity.

216.    Equity requires that Leadenhall be ordered to provide a full and complete accounting of all funds, assets, valuations, dispositions, and benefits derived from Haymarket's senior-secured capital, together with such further equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Haymarket respectfully prays that judgment be entered in its favor and against Defendants, and that the Court award the following relief:

1.    Compensatory damages in favor of Haymarket and against Defendants, jointly and severally where applicable, in an amount to be determined at trial, but not less than $75 million, representing losses caused by Defendants' fraudulent concealment, misrepresentations, knowing diversion of senior-secured capital, tortious interference, and related misconduct;

2.    Punitive damages against Defendants, where available by law, based on Defendants' willful, knowing, and fraudulent conduct, including intentional concealment of material facts and deliberate misuse of Haymarket's senior-secured capital for Defendants' own benefit;

3.    Restitution, disgorgement, and equitable relief, including imposition of a constructive trust, requiring Leadenhall Capital and Leadenhall Life to disgorge and return all funds, proceeds, substitutions, and traceable value wrongfully obtained from Haymarket, including amounts received through unauthorized HoldCo Loan draws and ModCo-sourced payments;

4.    Declaratory relief declaring the respective rights and obligations of the parties as alleged herein, including declarations that Defendants had no right or entitlement to use, receive,

or retain proceeds of the HoldCo Loan or ModCo assets in violation of Haymarket's senior-secured rights;

5.      An accounting, ordering Leadenhall Capital and Leadenhall Life to provide a full and complete accounting of all funds, assets, proceeds, valuations, substitutions, and dispositions derived from or traceable to Haymarket's senior-secured capital, as alleged herein;

6.      Pre-judgment and post-judgment interest at the maximum rate permitted by law;

7.      Costs, expenses, and attorneys' fees, to the extent permitted by law or under equitable principles; and

8.      Such other and further legal and equitable relief as the Court deems just and proper.

Dated: December 23rd, 2025
New York, New York

**FOLEY & LARDNER LLP**

*/s/ Phara A. Guberman*
Phara A. Guberman
David Jordan (*Pro Hac Vice Pending*)
Phillip F. Hosp (*Pro Hac Vice Pending*)
90 Park Avenue
New York, NY 10016
(212) 338-3514
phara.guberman@foley.com
djordan@foley.com
phosp@foley.com

*Attorneys for Haymarket Insurance Company*